UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUSAN SABRINA-
RAYSHEL HICKS,

          Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.

_____/

Case No. 5:14-cv-14111

District Judge Judith E. Levy

Magistrate Judge Anthony P. Patti

## RECOMMENDATION REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 14) AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DE 17)

**I.     RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary

judgment (DE 14), **GRANT** Defendant's motion for summary judgment (DE 17),

and **AFFIRM** the Commissioner's decision.

**II.     REPORT**

Plaintiff, Susan Sabrina-Rayshel Hicks, brings this action under 42 U.S.C.

§§ 405(g) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying her applications for disability insurance (DI) benefits

and supplemental security income (SSI).  This matter is before the United States

Magistrate Judge for a Report and Recommendation on Plaintiff's motion for

1

summary judgment (DE 14), the Commissioner's cross motion for summary judgment (DE 17), Plaintiff's response (DE 19), and the administrative record (DEs 8-11).

When the instant lawsuit began, Plaintiff's was represented by attorney, Richard J. Doud of the law firm of Davidson, Breen, Doud, Steele & Ferguson, P.C. (the "Davidson firm").  During the pendency of this action, this case was temporarily transferred to a three-judge panel for consideration of the Commissioner's request for a global 60 day stay and the question of substitution of counsel in all pending cases of attorney Richard J. Doud.  (*See* Text-Only Order dated 5/20/15 and Administrative Order 15-AO-033.)  On June 9, 2015, the case was stayed.  (DE 20.)  On October 19, 2015, the panel concluded its work and transferred the case back to the judge to whom the matter was originally assigned, indicating that it was the responsibility of the originally assigned judge to determine when to lift the stay in the case.  (*See* Text-Only Order dated 10/19/2015 and Administrative Order 15-AO-045.)   This Court lifted the stay in this matter on November 6, 2015.  (DE 22.)

As a result of the panel's work, the Davidson firm was directed to send Plaintiff a letter indicating that no lawyers at that firm are permitted to represent her in this case.  The letter was also to provide her with the names of other lawyers who handle Social Security disability cases, as well as the State Bar of Michigan's

attorney referral telephone number.  Plaintiff was given 60 days from October 19, 2015 to retain a new lawyer or proceed without the assistance of counsel.  To date, there is no indication that Plaintiff has retained alternate counsel, other than another attorney from the Doud law firm, whose substitution request was denied by this Court.  (DE 22.)  On January 8, 2016, the Court issued a notice to inform Plaintiff that she could file a new motion for summary judgment or supplement the existing motion by informing the Court of her intention to do so on or before January 15, 2016.  (DE 24.)  The Court did not receive any notice from Plaintiff and will therefore proceed on the current briefing.

### A.    Background and Administrative History

#### 1.    Prior Case (No. 2:10-cv-13643-VAR-LJM (E.D. Mich.)

Plaintiff alleges her disability began on August 28, 2004.  (R. at 42, 664.) On November 2, 2005, Plaintiff completed an application for DIB.  (R. at 42-44.) Plaintiff applied for SSI on November 29, 2005.  (R. at 664-667.)[1]  Plaintiff's applications were denied initially and on reconsideration.  (R. at 36, 668, 37-40, 669-672.)

Plaintiff requested a hearing by an ALJ.  (R. at 41; *see also* R. at 69-75.) ALJ John Christensen held a hearing on August 12, 2008.  (R. at 331-354.)  On

---

[1] ALJ Christensen's October 14, 2008 decision and ALJ O'Leary's July 24, 2012 decision each state that Plaintiff's application(s) was(were) filed on October 31, 2005.  (R. at 16, 384 and 688.)

October 14, 2008, ALJ John L. Christensen determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 13-23, 685-695.) Plaintiff requested review of this decision.  (R. at 697-699.)  The Appeals Council denied the request for review on July 8, 2010.  (R. at 3-5, 700-702.)

Plaintiff filed a complaint with this Court on September 13, 2010.  (Case No. 2:10-cv-13643-VAR-LJM (E.D. Mich.)).  On November 28, 2011, Judge Roberts adopted the report of then-Magistrate Judge Michelson, who had recommended remand and explained, "On remand, the ALJ should adequately account for his determination that Plaintiff had 'moderate' difficulties in 'concentration, persistence, or pace' in his RFC and obtain additional VE testimony if necessary." (*See* R. at 385-424.)

### 2.    Instant Case

On January 24, 2012, the Appeals Council remanded the case to an ALJ.  (R. at 425-428, 704-707.)  On June 4, 2012, a hearing was held, presumably by ALJ JoErin O'Leary.  (R. at 739-761.)[2]  On July 24, 2012, ALJ O'Leary determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 368-384.)

---

[2] The June 4, 2012 transcript's cover page and introductory paragraph list Aaron Lemmens as the ALJ.  (R. at 739, 741.)  However, Aaron Lemmens was appointed as Plaintiff's representative, and the written opinion came from ALJ O'Leary.  (R. at 460-461, 368-384.)

Plaintiff requested review of the ALJ's decision on or about July 28, 2012.

(R. at 364-367.)  This request lingered for nearly two years, prompting  Plaintiff to

inquire about it in April 2014.  (R. at 360-363.)  On August 26, 2014, the Office of

Disability Adjudication and Review declined to assume jurisdiction.  (R. at 355-

357.)  Thus, ALJ O'Leary's decision became the Commissioner's final decision.

Plaintiff then timely commenced the instant action on October 24, 2014.

(DE 1.)

## B.    Plaintiff's Medical History

The administrative record contains more than 350 pages of medical records.[3]

Of particular note are those expressly cited in Plaintiff's motion:

- On January 10, 2004, Plaintiff was treated at Covenant
  Healthcare Emergency Care Center for evaluation of a
  headache.  The notes also indicate, "She is experiencing an
  episode of **low back and right leg pain** at this time for which
  she is seeing her doctor and undergoing testing."  Plaintiff was
  diagnosed with "**[m]igraine cephalalgia**, stabilized."  She was
  given one Demerol and Phenergan, which appears to have
  reduced the headache by 90 percent.  James R. LaFleur, M.D.
  gave her a small amount of nonrenewable prescription for
  Ultracet for use during the weekend.  (R. at 185-186 (emphases
  added).)

- Plaintiff was seen at the Baptist Medical Center on July 28,
  2004 for **asthma and dyspnea.**  (R. at 144-150.)[4]

---

[3] These records are located in two different parts of the administrative record.  (*See*
R. at 133-281 [Exs. 1F-14F], 282-288 [Ex. 15F], 289-312 [Ex. 16F], 313-330 [Ex.
17F], 503-579 [Ex. 18F], 580-600 [Ex. 19F], 601-617 [Ex. 20F], 618-656 [Ex.
21F], 657 [Ex. 22F] and 658-663 [Ex. 23F].)

- On March 17, 2005, Plaintiff was seen at Covenant Heathcare Emergency Care Center for the chief complaint of a **headache**. Among other things, these records note "a past medical history of migraine headaches . . ." Plaintiff was diagnosed with **sinusitis** and a **sinus headache**. (R. at 169-171.) A CT scan of the head was performed and revealed "[n]egative unenhanced head CT examination." (R. at 172.)

- On January 26, 2006, Plaintiff was examined by State of Michigan Disability Determination Service (DDS) licensed psychologist Edward G. Tava, Ed.D., who diagnosed **adjustment disorder with mixed anxiety and depressed mood**, and a global assessment of functioning (GAF) of 62. (R. at 208-212.)[5]

- Iftikhar A. Khan, M.D., of Saginaw Valley Neurosurgery, P.L.L.C., saw Plaintiff on or about May 30, 2007 for **frequent headaches** and **transient altered responsiveness**. Dr. Khan noted, "[i]t appears that she has **excessive daytime sleepiness issues** also." His notes reflect that he offered Plaintiff migraine preventative medicine, and that she would be started on Topamax. Dr. Khan also suggested some workup, such as an EEG and sleep study. (R. at 280-281 (emphasis added).)

---

[4] Dyspnea is "[s]hortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs; occurs normally during intense physical exertion or at high altitude." Stedman's Medical Dictionary 274360.

[5] The GAF scale was used to report a clinician's judgment of an individual's overall level of functioning. Clinicians selected a specific GAF score within the ten-point range by evaluating whether the individual was functioning at the higher or lower end of the range. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR). However, "the most recent version of the DSM does not include a GAF rating for assessment of mental disorders." *Bryce v. Comm'r of Soc. Sec.*, No. 12-CV-14618, 2014 WL 1328277, at *10 (E.D. Mich. Mar. 28, 2014).

- Dr. Khan saw Plaintiff on August 30, 2007, and noted, among other things, that "she reports her **headaches** have probably 70% decreased in frequency.  She is tolerating Topamax well."  Dr. Khan also noted "she does have a history of **snoring**, **unrestful sleep** and so on."  (R. at 279 (emphases added).)[6]

(*See* DEs 14 at 10-11.)

## C.   **Hearing Testimony**

### 1.   **Plaintiff's Testimony**

Plaintiff testified at the June 4, 2012 hearing, at which time she was 36 years old.  (R. at 742-756; *see also* R. at 42.)  She stated that she generally has aching all over her body and gets a lot of pain in her back and her right arm.  On a daily basis, her pain is between six and seven on a scale of one to ten.  (R. at 743.)  If she sits still, usually longer than 10 minutes, she falls asleep.  If she sits too long, then she needs assistance getting up.  (R. at 744-745.)  She has trouble sleeping at night and gets, at most, about two uninterrupted hours of sleep per night.  According to Plaintiff, she went through a sleep study and "they're supposed to be getting me a machine this week for me to sleep on."  She tries not to stand for more than 5 minutes, because her back "goes to burning."  (R. at 745.)  She can slowly walk for about ½ block, and she does not lift over five pounds.  She has difficulty bending over, squatting down and climbing or descending stairs.  (R. at 746.)  She has a

---

[6] Plaintiff claims these two records are evidence of sleep apnea.  (DE 14 at 11, R. at 279-280.)

driver's license, but she does not drive a car by herself because "I fall asleep behind the wheel, and if it's too far then I still need help to get in and out of the car." (R. at 747; *see also* R. at 752.)

She lives in her father's home with her two children (ages 11 and 13) and her brother. (R. at 751-752.) She has a chore provider, whose services were initially funded by Plaintiff's parents but now seem to be funded by a program. (R. at 751.)

Plaintiff testified that she was able to return to work as a "team leader" in private duty or home healthcare for a period of time, apparently since her August 12, 2008 testimony. (R. at 747-751.) Her job entailed screening prospective employee applicants, coordinating the care workers, reviewing their invoices, and troubleshooting, for which she was paid approximately $16,000 per year and was given "lots of nice things[,]" which may have included "$5,000 at a time." (*Id.*)

Plaintiff's rheumatologist is Carlos Diola, and he treats her for fibromyalgia and arthritis. (R. at 754, 755.)   She explained that she was taken off Piroxicam, because she was experiencing internal bleeding. She also testified to having taken Minocycline, but it caused yeast infections. (R. at 754.) She testified that she has a new medication, although she could not recall the name. (R. at 753.)

## 2.    Vocational Expert Testimony

Vocational expert (VE) Dr. Heckert testified at the hearing and answered five hypotheticals .  (R. at 756-760.)    The VE's combined testimony as to the first, second and third hypotheticals – the limitations of which mirror the RFC eventually adopted - indicated that such an individual could perform surveillance systems monitor jobs and packer or inspector jobs.  (R. at 757-759.)  The fourth and fifth hypotheticals concerned being off task 20 percent of the work day and being off of work more than 2 days a month, respectively, each of which the VE opined to be job preclusive.  (R. at 759-760.)

## D.    The Administrative Decision

On July 24, 2012, ALJ JoErin O'Leary issued her decision.  (R. at 368-384.) At Step 1 of the sequential evaluation process,[7] the ALJ found that Plaintiff has

---

[7] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the  review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

had substantial gainful activity since August 28, 2004, the alleged onset date. (R. at 374.) She noted that Plaintiff's earning records showed $5,633.60 in 2009 and $16,877 in 2010, the latter of which is more than $4,000 beyond the annual threshold. (R. at 374, 471-472.)

At Step 2, the ALJ found that Plaintiff had the following severe impairments: fibromyalgia, inflammatory and osteoarthritis, degenerative disc disease of the lumbar spine, degenerative disc disease of the right shoulder, asthma, adjustment disorder, and migraine headaches. (R. at 374-375.)[8]

At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (R. at 375-377.)

Between Steps 3 and 4 of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC")[9] and determined that Plaintiff:

> . . . has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant requires a sit/stand option allowing her to change positions at will. She is unable to perform any overhead reaching with her right upper extremity. She is able to perform occasional fingering and handling with her bilateral upper extremities. The claimant must avoid

---

[8] At Step 2, the ALJ notes that there is no indication Plaintiff has been diagnosed with or has received treatment for sleep apnea. (R. at 374.)

[9] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

concentrated exposure to occupational hazards such as unprotected heights and dangerous moving machinery. She must avoid concentrated exposure to extremes of temperatures, humidity, and pulmonary irritants. The claimant is limited to performing simple tasks in a low-stress work environment, which is defined as work requiring no more than occasional decision-making or changes in the work setting. The claimant is unable to perform fast-paced or production-rate pace work.

(R. at 377-382.) At Step 4, the ALJ determined that Plaintiff was unable to perform her past relevant work as a customer service representative, personal clerk, supervisor of network control operators, data entry clerk, secretary and nurse assistant, based upon the VE's testimony. (R. at 382.)

At Step 5, considering Plaintiff's age, education, work experience and RFC, and the VE's testimony, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including surveillance system monitor and inspector, noting that, "Respectively, there are 750 and 2,000 of these jobs in existence in Michigan." (R. at 383.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 384.)

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal

standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*,

581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a

decision of the Commissioner will not be upheld where the SSA fails to follow its

own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting

*Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## F.    Analysis

Plaintiff asserts that the ALJ erred by improperly discounting her credibility

and failing to properly evaluate the medical record evidence (DE 14 at 6-11, 14),

which, in turn, led to an inaccurate hypothetical to the VE that did not accurately

portray Plaintiff's impairments (*Id*. at 6, 9-12.)  In addition, she briefly mentions

the treating source rule, but does not explain how the ALJ erred in this regard  (DE

14 at 12-14), although she returns to this subject in her reply brief, arguing that the

ALJ's "blanket dismissal" discounting the treating physician's opinions lacked the

necessary specificity.  (DE 19, ¶ 3.)  She also generally argues that "the

Commissioner failed to satisfy [her] burden of proof . . . ." at Step 5, urging that

the ALJ's finding that the existence of 750 surveillance system monitor and 2,000

inspector jobs in Michigan did not constitute "significant numbers." (DE 14 at 1 ¶

3, DE 14 at 6, 8-9,11).

The Commissioner opposes the motion.  (DE 17.)  First, she argues that substantial evidence supports the ALJ's assessment of Plaintiff's RFC, with the following sub-arguments:

    (i)    The ALJ properly weighed the credibility of Plaintiff's subjective statements in assessing her RFC.

    (ii)    The ALJ properly weighed Dr. Diola's opinion.

    (iii)    Plaintiff did not develop, and thus waived, her additional challenges to the ALJ's RFC finding.

(DE 17 at 14-21.)    Second, the Commissioner argues that substantial evidence supports the ALJ's Step 5 determination.  (DE 17 at 21-22.)

Plaintiff, via attorney James W. Smith of the Davidson firm, filed a reply. Among other things, Plaintiff contends the ALJ ignored record evidence.  (DE 19 ¶¶ 1-2.)  Plaintiff also takes issue with the ALJ's assignment of "little weight' to Dr. Diola's treating opinion.  (DE 19 ¶ 3.)

Plaintiff has been put in an unfortunate situation by her former counsel (Richard J. Doud), who, among other significant shortcomings in his briefing, once refers to Plaintiff by the wrong name, presumably that of another client.  (DE 14 at 8.)  As noted above, due to myriad issues, her counsel of record and his law firm were removed from this case (and all Social Security appeals in the Eastern District of Michigan).  Plaintiff did not take the opportunity to retain new counsel and chose not to re-file or supplement the current briefing, despite this Court's

invitation to do so.  (DE 24.)  Therefore, the Court will limit its consideration to those matters arguably presented by Plaintiff's motion and reply (DEs 14, 19), even if, as discussed below, the briefing on those matters is inadequate, and to a consideration of the administrative record for any obvious errors in the ALJ's conclusions.  *See Brinkley v. Comm'r of Soc. Sec.*, No. 14-13560, 2015 WL 1637598, at *2-3 (E.D. Mich. Apr. 13, 2015) (where Plaintiff is *pro se*, the Court may "review[] the administrative record for obvious errors in order to affirm the Commissioner's conclusions . . . ." (internal citations and quotations omitted)).

### 1.    The RFC is Supported By Substantial Evidence in Light of the Proper Weighing of Plaintiff's Credibility

Plaintiff's RFC is "the most [he or she] can still do despite the physical and mental limitations resulting from [his or] her impairments."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); s*ee also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  The determination of Plaintiff's RFC is an issue reserved to the Commissioner and must be supported by substantial evidence.  20 C.F.R. §§ 404.1527(3), 416.927(e).  "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'"  *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).

Pursuant to Social Security Rule 96-8p, the RFC assessment must include:

> [A] narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).   In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96-8-, 1996 WL 374184, at *6-7.

Here, Plaintiff claims the ALJ erred by indicating her testimony was not credible.  Plaintiff argues that objective medical evidence supports her testimony. As support for this position, she points to the aforementioned January 10, 2004 records from Covenant ER for back problems (R. at 185), July 28, 2004 records from Baptist Medical Center for asthma (R. 146), the January 26, 2006 notes of Dr. Tava for mental problems (R. at 208-212), May 30, 2007 and August 30, 2007 notes of Dr. Khan for sleep apnea (R. at 279, 280), and March 17, 2005 records of Covenant ER for migraines (R. at 169).  According to Plaintiff, these records support her testimony regarding pain, sitting longer than 10 minutes, sleep apnea, standing, sitting and lifting/carrying, and she contends that the absenteeism and off task hypotheticals more adequately represented her.  (*See* DE 14 at 10-11, 743-746, 759-760.)  It is Plaintiff's position that she "would only be capable of engaging in substantial gainful activity only by enduring great pain . . . ."  (DE 14 at 14.)

16

I conclude that the ALJ's RFC assessment is supported by substantial evidence and the ALJ did not err by discounting Plaintiff's credibility.  The ALJ's "assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor."  *Infantado v. Astrue,* 263 F. App'x 469, 475 (6th Cir. 2008).  "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."  *Rogers*, 486 F.3d at 247.  It is for this reason that the ALJ's credibility findings have at times been characterized as "unchallengable."  *Payne v. Comm'r Soc. Sec.,* 402 F.App'x 109, 113-114 (6th Cir. 2010); *see, Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) ("A circuit court . . . may not review a determination of credibility**.**  It is for the Secretary and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony.") (alteration omitted).  Moreover, "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence."  *Walters v. Comm'r Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997).

Here, the ALJ made several well-supported observations regarding inconsistencies in the record.  For example, in stating that "[m]edical techniques have not revealed findings that substantiate the claimant's allegations[,]" the ALJ noted that a December 7, 2005 "cyclic citrullinated peptide CCP AB IGG" test,

which was negative, "did not reveal results consistent with rheumatoid arthritis."

(R. at 251, 379).  Further, the ALJ found the March 7, 2012 operative report of

Shawn Ingles, D.O., to whom Plaintiff allegedly reported having done "a lot of

yelling/sideline coaching at her childrens' sporting events, such as basketball,"

inconsistent with her "allegations of disabling pain . .  and asthma."  (R. at 589,

381.)  In addition, the ALJ pointed to various objective tests, such as a January 23,

2004 EMG study of the right upper and lower extremities, which revealed, in part,

no "clear electrodiagnostic evidence of a radiculopathy or generalized peripheral

neuropathy."  (R. at 136), a March 29, 2007 MRI of the right shoulder, which

revealed "[*m*]*ild* subdeltoid bursal thickening[,]" (R. at 264) (emphasis added); a

May 28, 2010 cervical spine CT, which revealed:

> The vertebral body height, alignment and bone mineralization within
> normal limits.  There is no evidence of acute fracture or dislocation.
> The visualized lung apices are clear.  There is no significant
> prevertebral soft tissue swelling.  There is a tiny central protrusion at
> C5-C6.  MRI examination is more sensitive for disc protrusions.

(R. at 560); and a November 15, 2011 MRI of the lumbar spine, which revealed

"[d]egenerative disk disease at L4-5 with no disk protrusion or disk herniation or

spinal stenosis evident[,]" (R. at 642).  (R. at 379.)  Furthermore, the ALJ stated:

"the claimant's ability to work in 2009 and 2010, after her alleged onset date,

further lessens the credibility of the claimant's allegations of disability because she

is alleging disabling from 2004 to present, yet she was able to work during two calendar years after her alleged onset date."  (R. at 380.)

Accordingly, the ALJ did not err in her credibility assessment as it was supported by substantial evidence.

### 2.    The ALJ Did Not Err at Step 5.

#### a.    The ALJ Propounded a Proper Hypothetical to the VE

When, as here, an ALJ concludes that a claimant does not have the RFC to perform his or her past relevant work, the burden shifts to the Commissioner to show that Plaintiff "possesses the capacity to perform other substantial gainful activity that exists in the national economy."  *Varley v. Sec'y of Health & Hum. Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  This requires the Commissioner to "make a finding supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002) (internal citations omitted).

Such substantial evidence "may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only if the question accurately portrays [the claimant's] individual physical and mental impairments."  *Id.*  "A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the

Plaintiff can perform." *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 927 (E.D. Mich. 2005).

Here, the ALJ concluded that Plaintiff could not perform her past relevant work, because she was limited to a sedentary RFC with certain restrictions, and the VE testified that Plaintiff would be unable to perform any of her past jobs, all of which were skilled, given the RFC limitations.  (R. at 377-378, 382, 757.)  ALJ O'Leary relied on the VE's testimony that there were sufficient jobs available in the regional economy at the sedentary exertional level that could be performed by an individual with Plaintiff's limitations.  (R. at 383, 757-759.)  Plaintiff argues that, because the ALJ improperly discounted Plaintiff's credibility, her hypothetical to the VE relied upon an inaccurate RFC that did not reflect Plaintiff's impairments.  (R. at 14 at 6, 9 & 10.)  Plaintiff also argues that the hypotheticals regarding absenteeism and percentage off task "much more adequately represented Ms. Hicks[,]" especially given her testimony about fatigue and lack of sleep caused by her impairments.  (DE 14 at 11.)  In essence, she asks the Court to give greater weight to her subjective complaints than did the ALJ; however, it is not for the Court to reweigh the evidence in Plaintiff's favor on appeal.  *See Haun v. Commissioner of Social Sec.,* 107 F.App'x 462, 465 (6th Cir. 2004) ("We may not reweigh conflicting evidence on appeal, but instead must affirm Judge Davis's decision because substantial evidence supports it.").

As correctly noted by the Commissioner, "Despite, framing her argument as a step-five challenge, Plaintiff actually attacks the ALJ's RFC finding as unsupported."  (DE 17 at 14.)  By framing her argument in this way, Plaintiff attempts to shift the burden of proof from herself to the ALJ, since the burden remains with the claimant until Step 5.  *Jones v. Comm'r Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) ("Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work . . . .")  However, as addressed above, the ALJ's decision to discount Plaintiff's credibility and the resulting RFC were well-supported by the record.   Regardless of how one frames the issue, it was not in error for the ALJ to rely on the VE's response to a hypothetical question that incorporated an RFC finding which was supported by substantial evidence.  *See Varley*, 820 F.2d at 779 ("Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question, but only if the question accurately portrays [plaintiff's] individual physical and mental impairments.") (quotations and citations omitted).

> **b.    The ALJ Correctly Found that a Significant Number of Jobs Exist**

Additionally, there is the question of whether the number of jobs to which the VE testified constituted a "significant number."  (R. at 757-759.)  At Step 5, the ALJ noted that there were 750 surveillance system monitor jobs and 2,000

inspector jobs in Michigan.  (R. at 383.)[10]  Plaintiff contends, without citing

authority, that "a finding of these two jobs in such minimal numbers should not be

deemed to raise to significant numbers[,]" and "such minimal jobs that the VE

found should not have been deemed substantial given their numbers."  (DE 14 at

11-12.)  Notably, Plaintiff attacks the number of available jobs by breaking them

down into "750 and 2,000 respectively in Michigan[,]" rather than aggregating

them.  (DE 14 at 11, R. at 383.)  However, the ALJ's finding that a claimant is not

disabled because there are significant jobs which she could perform in the local

economy need not be supported by particular threshold numbers for *each job

available*, but rather, may rely upon the *aggregate number* of all such jobs that the

claimant could perform.  *See, Witty v. Comm'r of Soc. Sec.*, No. 3:11 CV 662, 2012

WL 7809073, at *19 (N.D. Ohio July 23, 2012) *report and recommendation

adopted*, No. 3:11 CV 662, 2013 WL 1284254 (N.D. Ohio Mar. 25, 2013) (where

---

[10] In response to the first hypothetical, the VE testified to 750 surveillance system
monitor jobs.  (R. at 757.)  The VE's response to the second hypothetical, which
added the sit/stand option, reduced the numbers by 65 percent, which would have
reduced the number to 262.5 surveillance system monitor jobs.  (R. at 758-759.)
Then, in response to the third hypothetical, which included occasional handling or
fingering with the bilateral upper extremities, the VE testified, "I would retain the
surveillance systems monitor jobs and some 2,000 of the – no, and then I would
add 2,000 packer or inspector jobs . . . ."  (R. 759.)  Thus, it appears the ALJ's
finding of 2,750 total surveillance system monitor and inspector jobs (R. at 383)
does not reduce the 750 surveillance system monitor jobs by 65 percent.  However,
even if the ALJ had used a total of 2,263, my above recommendation would stand.

the aggregate number represented 3 jobs, one of which alone satisfied the significant numbers requirement).

Moreover, notwithstanding Plaintiff's unsupported "hint" of an argument that "the entire [S]tate of Michigan" constitutes too broad of a geographic region to be considered in determining available job opportunities (DE 14 at 11, R. at 758), the regulatory and case law indicate otherwise.   Indeed, the governing regulation, 20 C.F.R. § 404.1566(a), specifically states that the Agency considers whether "work exists in the national economy" based upon whether "it exists in significant numbers either in the region where you live or in several other regions of the country," and "It does not matter whether…[w]ork exists in the immediate area in which you live." *See,* *Pollice v. Sec'y of Health & Human Servs.*, 843 F.2d 1392 (6th Cir. 1988) ("The fact that the statute speaks in terms of work existing in the national economy and does not restrict the Secretary to consideration of work that exists in the immediate area of a claimant's residence gives the Secretary sufficient latitude to treat an entire state as the region to be considered."); *see also*, *McCormick v. Sec'y of Health & Human Servs.*, 861 F.2d 998, 1002 (6th Cir. 1988) ("This argument must be rejected because both vocational experts found that a significant number of jobs exists in the State of Michigan at the sedentary level ….").

As the Commissioner further points out, even if Plaintiff's argument is not waived by her failure to develop and support it with legal authority, there is case law to support the ALJ's conclusion that 2,750 (or 2,263) jobs in Michigan are more than sufficient to constitute a "significant number." (DE 17 at 22.) For example, the Sixth Circuit has instructed:

> We are not blind, however, to the difficult task of enumerating exactly what constitutes a "significant number." We know that we cannot set forth one special number which is to be the boundary between a "significant number" and an insignificant number of jobs. The figure that the ALJ here found is *not* that magic number; the 1350 figure is to be viewed in the context of this case only. A judge should consider many criteria in determining whether work exists in significant numbers, some of which might include: the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on. The decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation.

*Hall v. Bowen*, 837 F.2d 272, 273-275 (6th Cir. 1988); *see also Riser v. Comm'r of Soc. Sec.*, No. 13-11135, 2014 WL 1260127 (E.D. Mich. Mar. 26, 2014) (Rosen, C.J., *adopting report and recommendation* of Michelson, M.J.) ("although Riser's challenge to the ALJ's step-five finding is very close, the Court believes that, under the assumption that the ALJ findings were correct up to step five, the *Hall* factors and foregoing precedent suggest that 1,000 hand-packager jobs in Michigan constitute a 'significant number' in this case.").

### 3.   The ALJ Appropriately Weighed Opinion Evidence.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(d).  The regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).  "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists."  20 CFR § 404.1527(e)(2)(i).  The ALJ must, however, "consider findings and other opinions" of State Agency medical or psychological consultants.  Id.

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ."  20 C.F.R. § 416.927(d)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009).  To qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant.  20 C.F.R. § 404.1502.

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Wilson*, 378 F.3d at 544 (discussing 20 C.F.R. § 404.1527). Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] [the claimant's] treating source's opinion." 20 C.F.R. § 416.927(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's

26

application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.

In her opening brief, Plaintiff merely provides a stock tutorial on the law of the treating physician's rule, but does not specify how the ALJ purportedly erred in this matter, or even provide the name of a treating physician whose opinion she contends was improperly weighed. (*See* DE 14 at 12-14.) In most cases, I would conclude that Plaintiff had waived the issue, but, given the special circumstances in this case, including the fact that Plaintiff's reply brief finally comes around to identifying Dr. Diola as a treating physician and takes issue with the ALJ's assignment of weight to Dr. Diola's treating opinion (DE 19 ¶ 3), I will address the ALJ's treatment of the opinion evidence.

Within her Step 4 RFC determination, ALJ O'Leary made at least two assignments of weight. First, she assigned "little weight" to Carlos Diola, M.D.'s opinion, presumably his June 26, 2012 medical source statement. (R. at 380, 657.) Among other things, Dr. Diola had noted severe limitations of the upper and lower extremities. (R. at 380, 657.) The ALJ found Dr. Diola's opinion inconsistent with several treatment records, generally citing eight (8) exhibits. (R. at 380, R. at 135-143 [Ex. 2F], R. at 160-186 [Ex. 4F], R. at 228-255 [Ex. 9F], R. at 256-260 [Ex. 10F], R. at 261-264 [Ex. 11F], R. at 282-288 [Ex. 15F], R. at 313-330 [Ex.

17F], R. at 503-579 [Ex. 18F]).[11]  Particularly, I note the January 30, 2011 St.
Mary's ER records, which indicate Plaintiff "ambulates without assistance[.]"  (R.
at 536) and the Covenant Health Care ER November 9, 2011 records, which
indicate Plaintiff "was able to get up and ambulate and she walked without
difficulty."  (R. at 641).[12]  Presumably acknowledging these records, the ALJ
stated, "[t]here is no indication in the objective medical evidence that the claimant
has extreme functional limitations with the claimant's extremities as opined by Dr.
Diola."  (R. at 379-380.)

The ALJ also found Dr. Diola's opinion inconsistent with "his conservative
management of the claimant's symptoms with medications."  As she expressly
stated in her decision, the ALJ noted that, "There is no indication that Dr. Diola
suggested the claimant pursue surgery or other forms of treatment modalities."  (R.
at 380.)[13]  She further noted that, "Imaging during the relevant period has been

---

[11] In his reply, Plaintiff seems to label this a "blanket dismissal," claiming that "a
true look at the record reveals Dr. Diola's opinion is not inconsistent with the
record as the ALJ claims[,]" and repeatedly citing an approximately 350 page
range of medical records.  (DE 19 ¶¶ 2 & 3, R. at 385-738.)  However, this is the
subject of a Step 4 RFC challenge, a burden of proof which remains upon Plaintiff.
*Jones,* 336 F.3d at 474.

[12] The Court notes that January 11, 2012 Covenant Health Care ER records note
what is apparently Plaintiff's own subjective report that she "is able to ambulate
however this causes her pain."  (R. at 643.)

[13] Here, the ALJ generally refers to Exhibits 20F, 22F and 23F, which contain
several notes from Dr. Diola.  (*See*, *i.e.*, R. at 602-612, 657 and 658-661.)  The

generally unremarkable except for some degenerative findings in the claimant's shoulders and lumbar spine[,]" as well as negative imaging of the claimant's cervical spine.  (*Id.*)[14]

In the end, Dr. Diola's June 26, 2012 opinion that Plaintiff can occasionally lift/carry/upward pull less than 10 pounds, frequently lift/carry/upward pull less than 10 pounds, and stand/walk less than 2 hours, in addition to the opinion that Plaintiff must alternate sitting and has severe limitations of the upper and lower extremities, is largely consistent with the ALJ's assessment of sedentary work, as limited in the July 24, 2012 Step 4 RFC determination.  (R. at 377-382, 657.)[15]  In other words, the ALJ seemingly afforded controlling weight to the opinion of Plaintiff's treating physician, and it is consistent with the RFC assessed.[16]

---

ALJ also referred to Exhibit 21F.  (*See* R. at 618-656.)  However, these are records from Covenant HealthCare.

[14] Here, the ALJ generally refers to Exhibits 11F, 17F and 21F, which include several imaging results.  (*See*, *i.e.*, R. at 261-264, 327-330 and 625-628, 634-635, 642, 652-654.)

[15] Pursuant to the regulations, "sedentary work" involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

[16] Although not raised as a basis of her appeal in either of her briefs, in my consideration of the administrative record for any obvious errors in the ALJ's conclusions, I note that ALJ O'Leary assigned "moderate weight" to the March 30,

### 4.    The RFC Accounts for Plaintiff's Various Conditions

Contrary to Plaintiff's argument here, the ALJ's RFC does take her

subjective complaints into account in the RFC assessment.  In fact, ALJ O'Leary

explained how she accounted for Plaintiff's conditions.  For example, she

accounted for Plaintiff's inflammatory bowel syndrome diagnosis by limiting her

to a restricted range of sedentary work (R. at 374-375); musculoskeletal pain /

degenerative changes in bilateral shoulders and lumbar spine by limiting Plaintiff

to a restricted range of sedentary work with a sit/stand option and limiting use of

bilateral upper extremities (R. at 380); asthma by limiting her to sedentary work

with certain environmental limitations (R. at 381); migraine headaches and severe

mental impairments (presumably adjustment disorder) by limiting Plaintiff to

performing simple tasks in a low-stress work environment and/or limiting Plaintiff

from performing any fast-paced or production work (R. at 381-382).  Moreover,

---

2006 psychiatric opinion of Zahra Yousuf, M.D. , a state agency reviewer, which
noted the CE's January 26, 2006 diagnosis of adjustment disorder with mixed
anxiety and depressed mood, and further noted mild "restriction of activities of
daily living" and "difficulties in maintaining concentration, persistence, or pace."
(R. at 213-227, 382.)  Specifically, the ALJ found Dr. Yousuf's opinion
"persuasive in that there is very minimal evidence regarding any mental functional
limitations due to the claimant's severe mental impairments."  In arriving at this
conclusion, the ALJ noted that, although the consulting psychologist, Dr. Tava,
assessed Plaintiff as having only mild symptoms, having assigned Plaintiff a GAF
of 62, Plaintiff had severe mental impairments "due to Dr. Tava's diagnosis of
adjustment disorder with mixed anxiety and depressed mood."  (R. at 381-382,
208-212.)  The ALJ appropriately accounted for this "by limiting her to simple
work performed in a low stress work environment." (R. at 382.)

the limitation of no overhead reaching with her right upper extremity appears to accommodate the Step 2 severe impairment of degenerative disc disease of the right shoulder.  (R. at 374, 377.)  In addition, the ALJ included the limitation of avoiding concentrated exposure to occupational hazards, perhaps to accommodate Plaintiff's testimony about falling asleep after sitting still for more than 10 minutes.  (R. at 377, 744.)

To the extent Plaintiff's complaints of pain were supported by the record, the ALJ took those complaints into consideration and incorporated them into the RFC. She then appropriately relied on the VE's response to her hypothetical questions to conclude that jobs existed in significant numbers in the regional economy for an individual with Plaintiff's limitations, and appropriately concluded that she was not disabled under the Social Security Act.

### G.    CONCLUSION

In sum, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment (DE 14), **GRANT** Defendant's motion for summary judgment (DE 17), and **AFFIRM** the Commissioner of Social Security's decision.

### III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: February 17, 2016  s/Anthony P. Patti
           Anthony P. Patti
           UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record on February 17, 2016, electronically and/or by U.S. Mail.

           s/Michael Williams
           Case Manager for the
           Honorable Anthony P. Patti